***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Harris and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or rehear the parties. The Full Commission affirms the Opinion and Award of Deputy Commissioner Harris and enters the following Opinion and Award:
 ***********
As set forth in the Pre-Trial Agreement and Deputy Commissioner Harris' September 23, 2010 Opinion and Award, the Full Commission addresses the following:
 ISSUES
1. Whether defendants' Form 24 Application should have been approved? *Page 2 
2. Whether defendants are entitled to terminate payment of temporary total disability compensation to plaintiff?
3. Whether defendants wrongfully terminated plaintiff's vocational rehabilitation services?
4. Whether defendants should be compelled to provide further vocational rehabilitation services to plaintiff?
5. Whether plaintiff is entitled to attorney's fees pursuant to N.C. Gen. Stat. § 97-88.1?
 ***********
The Full Commission finds as a fact and concludes as a matter of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to the North Carolina Workers' Compensation Act.
2. On August 23, 2006, plaintiff experienced a compensable work-related injury to his shoulder during the course of his employment with defendant-employer.
3. On and around August 23, 2006, an employee-employer relationship existed between plaintiff and defendant-employer.
4. Hewitt Coleman is the servicing agent on the risk in this matter.
5. Plaintiff's pre-injury average weekly wage is $365.24, which yields a weekly compensation rate of $243.50.
6. Plaintiff remains out of work at this time, and plaintiff continues to receive weekly temporary total disability ("TTD") benefits of $243.50 in reference to the compensable work injury of August 23, 2006 to his left upper extremity. *Page 3 
7. On October 5, 2009, Special Deputy Commissioner Jennifer Boyer disapproved defendants' Form 24 Application to terminate disability benefits in this matter.
8. Defendants have appealed from said ruling by Special Deputy Commissioner Boyer.
9. At all times after August 22, 2008, plaintiff has lacked the proper documentation that would be required for him to work legally in the United States of America.
 *********** EXHIBITS
The following documents were accepted into evidence by Deputy Commissioner Harris as stipulated exhibits:
 • Exhibit 1: Executed Pre-Trial Agreement
 • Exhibit 2: Industrial Commission Forms
 • Exhibit 3: Plaintiff's medical records
 • Exhibit 4: Vocational rehabilitation reports
 • Exhibit 5: Plaintiff's discovery responses
 • Exhibit 6: Form 24 materials and Order
 • Exhibit 7: Labor market survey prepared by Allison Parker dated 4/29/09
 • Exhibit 8: Report prepared by John P. McGregor
Transcripts of the depositions of the following were also received by Deputy Commissioner Harris post-hearing:
 • Dr. David R. Allen (with defendants' Exhibit A)
 • Kim F. Deal, MS, CRC (with Exhibits 1 2) *Page 4 
 • Jackie Jessie, BA, CDMS (with plaintiff's Exhibit 1 and defendants' Exhibit 1)
 • Allison Parker, M.Ed., CRC (with defendants' Exhibit 1)
 • John McGregor, M.S., CDMS, CVE (with Exhibit 1)
 ***********
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff is a native of Mexico who came to the United States in 1995. He resides in Fairmont, North Carolina, which is in Robeson County.
2. Plaintiff testified that his date of birth was February 10, 1947. His medical records showed his date of birth as November 19, 1953. It would appear that plaintiff is somewhere between 57 and 64 years old.
3. Plaintiff can speak only a few words of English and testified at the hearing through an interpreter. His native language is Spanish. Plaintiff never received any formal schooling and cannot read Spanish.
4. Plaintiff is right-handed.
5. Plaintiff does not have a driver's license and does not drive.
6. After coming to the United States, plaintiff performed agricultural labor and processed chickens. As of the date of his injury in this claim, plaintiff was a production worker processing turkey breasts at defendant-employer's plant in St. Paul's, North Carolina. *Page 5 
7. After suffering his compensable injury to his left shoulder, plaintiff initially treated at Doctor's Urgent Care, but was quickly transferred to the care of Dr. Allen, an orthopedist in Lumberton, North Carolina.
8. Dr. Allen first saw plaintiff on September 14, 2006, and diagnosed disruption of the long head of the left biceps tendon and left acromial impingement.
9. Dr. Allen treated plaintiff conservatively for a number of months and finally discharged him from his care on April 19, 2007, with instructions for plaintiff to return as needed. As of April 19, 2007, plaintiff was still symptomatic in his left shoulder.
10. Plaintiff and defendants executed a Form 21 Agreement whereby plaintiff received compensation for a ten percent (10%) permanent partial impairment ("PPI") rating to plaintiff's left arm. This Form 21 Agreement was approved by the Commission on December 18, 2006.
11. Just prior to discharging plaintiff from care, Dr. Allen had recommended that plaintiff undergo surgery to repair the disruption of his left biceps tendon.
12. Defendants eventually approved the surgery, but with a different physician. Plaintiff underwent a left shoulder arthroscopy, mistakenly described in the operative note as a "right shoulder arthroscopy", on July 3, 2007, with Dr. Christopher Barnes, an orthopedist in Fayetteville.
13. Dr. Allen testified that had he performed surgery on plaintiff's left shoulder, he would have done an open procedure rather than an arthroscopic procedure, because he believed that outcomes tend to be more successful with open procedures.
14. After the surgery, plaintiff underwent physical therapy, and Dr. Barnes eventually released plaintiff with a twenty percent (20%) PPI rating to his left arm. *Page 6 
15. On May 13, 2008, plaintiff returned to Dr. Allen for ongoing complaints of pain in his left shoulder. Dr. Allen concurred with the twenty (20%) percent PPI rating, and he assigned permanent work restrictions of no lifting greater than ten (10) pounds with his left arm and no repetitive overhead activity with his left arm. Dr. Allen also recommended vocational rehabilitation for plaintiff.
16. Plaintiff last saw Dr. Allen on June 17, 2008. At that visit, plaintiff still had left shoulder pain, and Dr. Allen left the restrictions in place.
17. In July 2008, plaintiff began working with Kim Deal, a vocational rehabilitation professional with Carolina Case Management, whose services were contracted by defendants. At the initial meeting, Ms. Deal identified several barriers to employment that plaintiff faced, most notably his work restrictions, which placed him at the "sedentary" work level per the guidelines of the Dictionary of Occupational Titles ("DOT") published by the United States Department of Labor. The other barriers included plaintiff's inability to speak English, his limited transportation, and his work history consisting of only manual labor.
18. Ms. Deal recognized from the outset that she could not legally initiate job placement services for plaintiff. Nonetheless, she performed an extensive vocational assessment of plaintiff, and then formulated an individualized vocational rehabilitation plan. The goal of the plan was to increase plaintiff's job skills and make him job-ready.
19. In pursuit of this goal of making plaintiff job-ready, Ms. Deal's plan called for plaintiff to attend English-as-a-second-language ("ESL") classes twice per week at Robeson Community College. Ms. Deal arranged for plaintiff's transportation to the classes. *Page 7 
20. Plaintiff had a positive attitude and was fully cooperative with Ms. Deal's efforts. He enjoyed his classes and was beginning to learn some English. He continued taking the ESL classes until Ms. Deal went out on maternity leave in early February 2009.
21. When Ms. Deal went out, Jackie Jessie, a colleague at Carolina Case Management, took over plaintiff's case. At first, Jessie met with plaintiff at his ESL classes, but she then changed the meeting spot to the public library. She also instructed plaintiff to register with the Employment Security Commission.
22. When Ms. Jessie discovered that plaintiff was not able to work legally in the United States, she personally decided to terminate plaintiff's vocational rehabilitation services with Carolina Case Management and did so.
23. In April 2009, Allison Parker, another rehabilitation professional with Carolina Case Management, prepared a document entitled "Labor Market Survey", which described plaintiff's vocational circumstances and listed a number of jobs available in the local market where plaintiff lives. None of the jobs listed were described as being in the "sedentary" category, and most of them were described as being in the "light" category. The report did not provide the physical requirements or the specific duties for any of the jobs listed, nor did it include any job descriptions or job analyses for the listed jobs.
24. Ms. Parker made no effort to determine whether the jobs listed in her report were actually suitable for plaintiff, given his restrictions and other vocational barriers. According to Ms. Parker, she does not determine suitability because "that's up to the Commission." Also according to Ms. Parker, if there was a question about whether the duties of a job comported with someone's work restrictions, then a job analysis would have to be done. Ms. Parker made no *Page 8 
determination, and rendered no opinion, as to whether plaintiff was actually capable of obtaining any of the jobs listed in her report but for his immigration status.
25. As Ms. Parker testified, she would say that, of all the jobs listed in her report, just "three or four" might be suitable for plaintiff. She speculated that, based on the information provided to her by the employers, plaintiff might be able to do one of these four jobs.
26. John McGregor is a vocational expert with about twenty-five years of experience analyzing employment prospects for injured workers, primarily on behalf of employers and workers' compensation insurance carriers. At plaintiff's request, he reviewed Ms. Parker's report. According to Mr. McGregor, it would be impossible for plaintiff to qualify for and perform the types of jobs listed in Ms. Parker's report. Mr. McGregor made it clear that his opinion applied to each and every job listed by Ms. Parker.
27. With respect to the three or four jobs that Ms. Parker felt might be suitable for plaintiff, Mr. McGregor rejected each of them as being unsuitable for plaintiff. According to Mr. McGregor, the three housekeeping jobs were not shown to be suitable because the job duties were not provided and they were described as being in the "light" duty category, which was beyond Dr. Allen's permanent restrictions. Also, as Mr. McGregor noted, the DOT contains more than one entry for hotel cleaner, with duties ranging from "light" to "heavy."
28. With respect to the McDonald's dining room attendant position that was specifically identified by Ms. Parker as possibly suitable for plaintiff, Mr. McGregor, who actually provides rehabilitation services to McDonald's in North Carolina, confirmed that McDonald's did not typically offer a "dining room attendant" position. Rather, McDonald's had a "lobby maintenance" position listed. Mr. McGregor rejected any such position for plaintiff because, as listed, it called for someone who "like(d) to interact with people," which presumably *Page 9 
would call for someone who spoke and understood English. Also, the physical requirements of the position were unknown.
29. The Full Commission assigns more weight to the testimony of Mr. McGregor than to that of Ms. Parker. As Mr. McGregor testified, a labor market survey should include the actual physical requirements and actual duties for the listed jobs, which Ms. Parker's report did not. As Mr. McGregor further testified, when he is working to place an injured worker, he wants to evaluate a potential job himself first before recommending that the worker interview for it, in order to ensure that the worker has the best chance for success. Ms. Parker's report included jobs that were clearly beyond plaintiff's limited vocational aptitudes and physical restrictions, and Ms. Parker admitted that she did not consider whether plaintiff would actually be capable of obtaining and performing any of the jobs she listed.
30. Also, Mr. McGregor's testimony was supported by that of Ms. Deal, who confirmed that, when working with clients with ten (10) pound lifting restrictions, she had never succeeded in placing any of them in any field other than clerical work. Ms. Deal also confirmed that she had never succeeded in placing anyone with a restriction of no overhead lifting into any sort of position.
31. On September 4, 2009, defendants filed a Form 24 Application that essentially relied solely on Ms. Parker's report for their assertion that plaintiff's temporary total disability (TTD) compensation should be terminated. Plaintiff responded and included Mr. McGregor's findings in his response. In her Order of October 5, 2009, Special Deputy Commissioner Boyer disapproved the application and noted, among other things, that Mr. McGregor had noted that Ms. Parker's report did not outline the specific duties for the jobs listed. Defendants appealed *Page 10 
from the disapproval. The Full Commission finds by the greater weight of the evidence that defendants have engaged in stubborn, unfounded litigiousness.
32. As of the hearing before the Deputy Commissioner, plaintiff was living with his son and daughter-in-law and their children. Plaintiff did light housework at the home and helped with meal preparation and child care. He did not engage in activities outside his restrictions.
33. As of the hearing before the Deputy Commissioner, plaintiff's left shoulder still bothered him with quite a bit of pain. Plaintiff wanted to return to Dr. Allen, and as he testified, plaintiff has lost his strength in his left arm and does everything now with his right hand only.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff remains disabled, in that although he may be physically capable of some work, it would be futile for him to seek employment comporting with his permanent work restrictions due to his limited vocational history and his inability to speak or read English. N.C. Gen. Stat. § 97-29; Russell v. LowesProd. Distrib., 108 N.C. App. 762, 425 S.E.2d 454 (1993).
2. Once the claimant has established disability, the burden falls to defendants to produce evidence that suitable jobs are available that the claimant is capable of obtaining, taking into account both his physical and vocational limitations. Burwell v. Winn-Dixie Raleigh,114 N.C. App. 69, 441 S.E.2d 145 (1994). Where the claimant does not have immigration status to allow him legally to work in the United States, defendants must produce "sufficient evidence that there are suitable jobs plaintiff is capable of getting, `but for' his illegal alien status." Gayton v. Gage Carolina Metals, Inc.,149 N.C. App. 346, 560 S.E.2d 870 (2002). *Page 11 
3. In their Form 24 Application and in this proceeding, defendants have not met their burden to show that there are suitable jobs plaintiff is capable of obtaining, but for his immigration status. Therefore defendants are not entitled to terminate plaintiff's TTD compensation. N.C. Gen. Stat. § 97-18.1.
4. Defendants cite the unpublished decision of the Court of Appeals inParada v. Custom Maintenance, Inc. as support for their position. The Full Commission finds that decision distinguishable from the current matter as the claimant in Parada had been released without restrictions, and his treating physician had specifically reviewed and approved four job descriptions.
5. Defendants argue that Plaintiff should at least try one of the positions identified by Parker. However, only getting the claimant to the point that he could "at least try" a position, but for his immigration status, does not meet the Gayton standard. Due to plaintiff's permanent restrictions along with his other vocational barriers, he remains disabled. N.C. Gen. Stat. § 97-29.
6. While an undocumented claimant remains disabled, defendants may provide vocational rehabilitation, such as English classes, to the claimant in pursuit of putting him in position where he could be employed if he had legal status. Gayton,149 N.C. App. at 350, 560 S.E.2d at 873. However, defendants are not required to continue such vocational rehabilitation, and it cannot be concluded that they wrongfully terminated his vocational rehabilitation services.
7. With Ms. Parker's "labor market survey" as their only basis, defendants have brought the Form 24 proceeding and this appeal without reasonable grounds, and plaintiff is thus entitled to attorney's fees under N.C. Gen. Stat. § 97-88.1. *Page 12 
8. Plaintiff is entitled to further medical treatment for his compensable left shoulder condition as is reasonably required to effect a cure, provide relief and/or lessen the period of his disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 ***********
Based upon the foregoing stipulations, findings of fact, and conclusions of law the Full Commission makes the following:
 AWARD
1. Defendants' Form 24 Application remains DISAPPROVED, and defendants SHALL continue to pay weekly TTD compensation to plaintiff in the amount of $243.50 per week until plaintiff returns to work or further Order of the Commission.
2. Defendants may re-initiate vocational rehabilitation for plaintiff but are not required to do so.
3. Dr. Allen IS HEREBY DESIGNATED as plaintiff's authorized treating physician for his compensable left shoulder condition, and defendants SHALL, subject to the limitations period of N.C. Gen. Stat. § 97-25.1, authorize and pay for the treatment that he recommends for said condition.
4. Within twenty (20) days of receipt of this Opinion and Award, plaintiff's counsel shall submit to the Full Commission a petition for an attorney's fee and proposed Order. Plaintiff's counsel should provide an itemization of the time spent by her and her staff on this claim since defendants' filing of their Form 24 Application. Thereafter, the Full Commission will file an Order setting plaintiff's attorney's fee.
5. Defendants shall pay the costs.
This the 22nd day of March, 2011. *Page 13 
 S/__________________________ DANNY LEE McDONALD COMMISSIONER
CONCURRING:
 S/__________________________ STACI T. MEYER COMMISSIONER
 S/__________________________ CHRISTOPHER SCOTT COMMISSIONER *Page 1